IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-03342-NRN

M WELLES AND ASSOCIATES INC.,

Plaintiff,

v.

EDWELL INC.,

Defendant.

---

**ORDER ON
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
(Dkt. #21)**

---

**N. Reid Neureiter
United States Magistrate Judge**

This is a trademark case. Plaintiff M Welles and Associates, Inc. ("Plaintiff" or "Welles") claims the Defendant, Edwell, Inc. ("Defendant" or "Edwell"), is infringing on Plaintiff's word mark, "EDWEL" (written with one "L").

The parties unanimously consented to the jurisdiction of a United States Magistrate Judge. *See* Dkt. #15. Pursuant to the parties' consent and consistent with 28 U.S.C. § 636(c), Chief Judge Brimmer referred the matter to me for all purposes. *See* Dkt. #17.

## PROCEDURAL BACKGROUND

This matter comes before the Court on Plaintiff's Motion for Preliminary Injunction, filed March 24, 2022. *See* Dkt. #21.

I held what was to be a scheduling conference on March 30, 2022. Instead of entering a scheduling order, I set an evidentiary preliminary injunction hearing for May 26, 2022. I permitted the parties to conduct some limited pre-hearing discovery, including 10 interrogatories and 10 requests for production of documents. Each side was entitled to take one deposition. A schedule was set for full responsive briefing on the preliminary injunction motion.

Edwell filed an Amended Answer (Dkt. #26) and a Response to the Motion for Preliminary Injunction (Dkt. #27) on April 7, 2022. Plaintiff filed a Reply in support of the preliminary injunction (Dkt. #34) on May 2, 2022.

The Court held the preliminary injunction hearing on May 26, 2022. *See* Dkt. #42. The Court heard testimony from representatives of both Plaintiff and Defendant, and numerous exhibits were admitted into evidence.

Under Fed. R. Civ. Pro. 65(a)(2), "before or after beginning the hearing on a motion for preliminary injunction," the court may advance the trial on the merits and consolidate the trial on the merits with the hearing itself. I asked the parties their respective positions regarding advancing the trial on the merits and deeming the preliminary injunction hearing to be the trial itself. The parties conferred and submitted their respective positions on the question of advancing the trial on the merits. *See* Dkts. #44 and #45. Although both sides appeared amenable to treating the preliminary injunction hearing as the trial on the merits, there was some dispute about the particulars. In light of the apparent dispute, the Court will not convert the preliminary injunction hearing to a trial on the merits at this time, but, given the findings and

conclusions described below, the Court will set a status conference to determine how the Parties wish to proceed.

## SUMMARY OF ISSUE BEFORE THE COURT

As noted, this is a trademark dispute. Welles, the plaintiff, provides education, certification, and training for project management professionals ("PMP"). These programs are marketed under "Edwell" or "Edwell Programs." Plaintiff has also used the brand name "Edwel." Welles obtained a federal trademark registration on word "EDWEL" in 2016.

The Defendant Edwell (also referred to as "The Educator Wellness Project"), is a non-profit operation that seeks to provide emotional health and wellness programs and coaching to educators—a need that has grown exponentially as a result of the stresses put on educators as a result of the global COVID-19 pandemic. Edwell offers its education wellness programs through the websites www.edwell.org and www.educatorwellnessproject.org.

Welles claims that Edwell's marketing of its education wellness project and programs under the brand "edwell" is causing confusion with Welles' project management professional certification and training courses. Welles brings various trademark and unfair competition claims under the Lanham Act, 15 U.S.C. §§ 1051–1127, and state law. Specifically, it asserts claims for (1) infringement of a federally registered trademark under 15 U.S.C. § 1114; (2) false designation of origin under 15 U.S.C. § 1125(a); (3) false designation of origin under 15 U.S.C. § 1125(c); and (4) common law unfair competition and false designation of origin under Colorado law. *See* Dkt. #20, First Am. Compl.

In Welles' Motion for Preliminary Injunction (Dkt. #21), Welles claims that it is suffering irreparable injury because of Edwell's conduct marketing its education wellness programs using the "edwell" name. Welles asks for a preliminary injunction that would require Edwell to cease use of the "edwell" brand and name, cease use of the wwww.edwell.org website, and remove any content from that site. *See* Dkt. #21 at 17.

The critical issue to be decided in connection with the motion for preliminary injunction (and the case as a whole), is whether consumers (or potential consumers) of Welles' PMP programs, which are marketed under the "Edwel" brand, are likely to be confused by Edwell's educator wellness programs, which are being marketed to teachers under the "edwell" brand. *See Derma Pen, LLC v. 4EverYoung Ltd.,* 773 F.3d 1117, 1120 (10th Cir. 2014) (listing one of the critical elements of a Lanham Act claim for federal trademark infringement as whether "Defendant has likely confused customers by using a similar mark"); *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998) ("In every case, however, the key inquiry is whether the consumer is 'likely to be deceived or confused by the similarity of the marks.'" (quoting *Two Pesos*, *Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992))).

## LEGAL STANDARD

A preliminary injunction is appropriate if a trademark plaintiff can show (1) it is likely to succeed on the merits; (2) the denial of the preliminary injunction would result in irreparable harm; (3) a balancing of the equities favors a preliminary injunction; and (4) a preliminary injunction is consistent with the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

To succeed on its Lanham Act claims of trademark infringement and unfair competition, Welles must show the following elements:

(1) that Welles has a protectable interest in the trademark;

(2) that Edwell has used an identical or similar trademark in commerce; and

(3) Edwell has likely confused customers by using a similar trademark.

*1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1238 (10th Cir. 2013). "Confusion occurs when consumers make an incorrect mental association between the involved commercial products or their producers." *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1484 (10th Cir.1987) (quoting with approval *San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.*, 483 U.S. 522, 564 (1987) (Brennan, J., dissenting))).

To assess whether there is a likelihood of confusion between two marks, the court considers the following factors to be relevant: (1) the degree of similarity between the marks, including the marks' appearance, pronunciation, suggestion, and manner of display; (2) strength or weakness of the plaintiff's mark; (3) the intent of the alleged infringer in adopting its mark; (4) similarities and differences of the parties' goods, services and marketing strategies; (5) the degree of care likely to be exercised by purchasers of the goods or services involved; and (6) evidence of actual confusion, if any. *Heartsprings*, 143 F.3d at 554. "Some of these factors may prove more relevant than others, depending on the facts of each case; moreover, other cases may demand consideration of factors not mentioned here." *Id.* (citing *Jordache*, 828 F.2d at 1484). "No one factor is dispositive, and the final determination of likelihood of confusion must be based on consideration of all relevant factors." *Id.*

**FINDINGS OF FACT**

The Court makes the following findings of fact:

1. Michael Welles is President of the plaintiff, M Welles and Associates, Inc..

2. Welles does business as "Edwel."

3. Since 1992, Welles has provided training classes, seminars, and certification workshops, mostly in the project management professional ("PMP") space. The customers of Welles tend to be professionals in a variety of industries, including information technology, healthcare, education, and the military.

4. Welles has worked with a number of large organizations to provide professional certifications, including companies such as Abbott Laboratories, Pfizer, the United States Army, and the United States Navy, educational institutions such as Louisiana State University and Northwestern University, as well as energy companies and consulting groups, such as PricewaterhouseCoopers.

5. Prior to the advent of the internet as a marketing tool, Welles marketed its programs by sending out mass mailings and advertising in magazines, including trade publications. Today, with the dominance of the internet, Welles advertises extensively across social media platforms, including Facebook, Twitter, LinkedIn, and Reddit. Welles also advertises extensively through Google and sends out hundreds of thousands of e-mails directly to a 65,000-person customer list.

6. In connection with marketing its programs, Welles uses the "Edwel" brand. As Michael Welles' testified, Welles' programs are "education done well." The brand name "Edwel" is a bringing together of "E-D" and "W-E-L."

7. The brand name also had its origins in the names of the two original founders, James Edwards and Michael Welles. At the founding, the company was offering educational services, including English as a second language, accent reduction, mathematics, and statistical process control classes.

8. Welles established an internet presence in 1998, securing the domain name for Edwel.com; Edwel.net; Edwelprograms.com; Edwel.org; and Edwel.co. In 2003, seeing the similarities between "edwel" with one "L" and "edwell" with two "L"s, Welles secured the domain names for Edwell.com, Edwell.net, Edwellprograms.com, and Edwell.co.

9. Welles has worked to develop its website and Mr. Welles testified that Welles has spent upwards of $5 million building the brand over the years. Welles uses the mark "Edwel" every day in its operations, including on the internet, on stationary, in advertising across multiple platforms. The Edwel brand is prominently displayed in the course materials provided to students.

10. In August 2005, Welles filed for registration with the United States Patent and Trademark Office for the wordmark "Edwel"—with one "L". The mark was actually registered on March 29, 2016 in International Class 41 for "Training, mentoring, and tutoring services in the fields of project management and product management; Educational services, namely, conducting classes, seminars, workshops in the fields of project management and product management." Pl.'s Ex. 28. Mr. Welles understood that when he filed to register the "Edwel" mark, he was doing so in order to protect the mark for the specific services of training, mentoring, tutoring and educational services (classes, seminars, and workshops) in the field of project management.

11. As of February 2022, Welles has been using the Edwel mark for 30 years. During that time, Welles has enforced its mark, by sending cease and desist letters to other entities using the mark inappropriately.

12. Plaintiff's Exhibit 62 is a page from Welles' current website which uses the "Edwel" mark prominently, labeling the programs as "EdWel Programs."[1] Notably, the website page emphasizes PMP certification and course materials for the PMP Exam. It also has tabs for "Six Sigma" certification and "Scrum Master." All of these have generally to do with management training.

13. Plaintiff's Exhibit 63 is a page from Welles' Twitter feed that provides a description of Welles' services. It emphasizes, again, Welles' PMP programs, stating, "We have been teaching Project Management since 1992. Located in over 20 cities, EdWel is a proven leader in PMP certification."

14. Plaintiff's Exhibit 58 is a screenshot, taken from the masthead of the Washington Post's website, showing some of Welles' advertising and marketing efforts. The exhibit shows an Edwel banner advertisement, with the Edwel logo, and the words, "FAST TRACK YOUR CAREER! PMP Certification Training." According to Mr. Welles, Welles uses this kind of

---

[1] On their website and in marketing materials, the mark sometimes appears as "EdWel." *See, e.g.*, Pl.'s Ex. 63. Generally, I refer to the mark was "Edwel" except when quoting to Plaintiff's marketing materials.

      advertising to build the brand, potentially gain a sale, and to reinforce the brand in front of individuals who have recently visited the Welles website.

15. In addition to the EdWel.com website, Welles uses the Edwell.com (two L's) website. It began using that site in September of 2021. Welles began using the two-L version of the website in a protective move, in order to protect and defend the "Edwel" mark after he learned of Defendant's use of a similar mark.

16. Welles learned of the defendant, Edwell, Inc., in late July of 2021, when Mr. Welles was answering questions on the telephone from potential customers. One of the callers asked whether Welles taught its classes at the Denver Public Schools. Welles does not offer any classes in Denver Public Schools, so Mr. Welles was perplexed by the question.

17. So, Mr. Welles did a Google search to see if "Edwel" was being used by some of Welles' competitors. In conducting his search and including terms like Denver and "Edwell" (with two L's), he came across Defendant's website "edwell.org." After reading about the founders and the services provided, Mr. Welles became "even more concerned," because it was clear, in Mr. Welles' mind, that Defendant Edwell was "in the educational space." In Mr. Welles' view, this is the "coaching space" and "training space" where Welles has been providing services for years. Apparently, the question about Welles offering its courses in Denver Public Schools came about because Edwell is partnering with Denver North High School in some of its educational wellness programming, and the customer had seen the word "edwell" online associated with a Denver public school.

18. Mr. Welles testified that the Welles website has seen a decrease in traffic since Edwell's website has been in existence. I do not find this persuasive. There is no competent evidence tying what might be a seasonal decrease in Welles' website traffic to the existence of the edwell.org website.

19. As further evidence of customer confusion (beyond the person who asked whether classes were offered at Denver North High School), Mr. Welles noted another contact by a person who was concerned that the Welles' operation could be "sketchy" because he was having trouble locating the company on the internet. That person never mentioned edwell.org or discussed any confusion of Edwell with the Welles' programs. Nevertheless, because this reference to Welles' programs being "sketchy" came after the discovery of edwell.org, Mr. Welles "immediately assumed that confusion was rampant."

20. I do not find any persuasive tangible evidence of confusion between Defendant's Edwell's education wellness programming and Plaintiff's Welles' Edwel PMP offerings. The three bits of evidence about confusion

8

are utterly anecdotal and unpersuasive. There is no evidence connecting the decline in Welles' website's page views to the launch of the edwell.org website. The person who asked whether Welles offered its PMP programs at North High School is one incident that was cleared up immediately. And the fact that someone thought the Welles program might be "sketchy" has no demonstrated connection or relationship at all to the Defendant's education wellness programs or its edwell.org website.

21. Ms. Nicola Fleischer testified on behalf of Edwell. Ms. Fleischer is the Executive Director and a co-founder of Edwell. She is a former grade-school teacher and administrator. She attended graduate school at Yale University to obtain an MBA with a focus on nonprofit management. Her plan in attending graduate school was to work in the education and nonprofit space. Ms. Fleischer started with Edwell as an advisor and is now "fully in charge" of Edwell.

22. Edwell is a nonprofit organization dedicated to improving school-wide mental health and well-being. It began in earnest in the fall of 2020. Edwell accomplishes its objectives through coaching and capacity- building for educators.

23. The idea for Edwell started early in the pandemic, when one of Edwell's founders, in conducting research for a consulting project, interviewed a number of teachers and found a great need for teachers to have emotional support.

24. The name "Edwell" in the context of Edwell, Inc., means "to be an educator and be well—to have a sense of wellness."

25. Edwell has no employees, but it has 25 contractors providing its services to teachers.

26. Edwell's first program was wellness coaching for teachers. "Wellness coaching" is defined by Edwell as nonclinical mental health and wellness support. Edwell hoped to provide a way for struggling teachers to find and meet peers to provide support and guidance to figure out what they might need to improve their own mental health and well-being. In Edwell's view, wellness coaching provides a chance for a struggling teacher to connect with a peer, talk about personal wellness needs, and set individual goals.

27. Edwell's model is fully virtual and is about connecting a teacher with either one coach or a group of fellow educators in a confidential, context-removed environment.

28. Edwell's core mission is to keep more teachers in the classroom and make teaching a more sustainable profession. The mission has changed over

time to include the recognition that students' mental health also has an impact on the mental health of the teachers through compassion fatigue or secondary trauma. Edwell recognized that in order to improve the teaching profession, it needed to include students' mental health in the mission as well.

29. Edwell partners with schools and offers wellness support to teachers looking for assistance. Offerings include or included individualized coaching, group coaching, and a community platform (which has been discontinued). Edwell's coaches provide suggestions to teachers about certain tools or activities the teachers could use or adopt to move them toward the wellness goal. Coaching usually takes place on a Zoom meeting, with the coach asking questions and the client reflecting on those questions. Individual teacher clients go through a six-session cycle.

30. Edwell also works with school leaders in the schools to identify additional things that could be done in schools to improve teacher and student well-being. Edwell will be launching a new service next year, called "brain-based teaching," focused on equipping teachers with the tools they need to care for student mental health. This will include teaching teachers about the neurobiology of what happens when someone is experiencing chronic stress and how certain strategies can help rewire a child's brain, making them feel safe.

31. Edwell's customer base involves two layers. The first layer is the school district and individual school sites that contract with Edwell to bring services to the staff. The second layer of the customer base are the actual educators who sign up for Edwell's programs. All the schools and school districts currently receiving Edwell's services are K-12 public schools. Edwell at present has partnerships with ten public schools. Edwell does not target colleges or universities. It does not offer its services to any corporations.

32. Through May 2022, Edwell had provided its wellness programming to approximately 300 teachers.

33. Edwell has a website that uses the domain name "edwell.org." For a period of time in the winter of 2021-22, Edwell did try to transition to use the domains, EducatorWellnessProject.org" and "TheEducatorWellnessProject.org." Even today, the phrase "Educator Wellness Project" appears in certain locations on the Edwell web page. There was some, not persuasive, testimony that changing the domain name adversely affected Edwell's visibility on the web and made it harder for Edwell's educator clients to find the site. More importantly, Edwell decided that they had a good brand with the Edwell name, in that it accurately reflected the organization's priority of supporting the well-being

    of everyone in the school building—not just the educators, but also students and staff. In addition, Edwell felt that it was being "bullied" by Welles to drop the "Edwell" name, and it decided that it would not capitulate to pressure. Nevertheless, Edwell does use the "Educator Wellness Project" branding on Instagram and Facebook and other social media, in addition to the "Edwell" brand.

34. Edwell does not offer any PMP coaching or training, any Six Sigma courses, or any scrum courses or training. These are not programs or skill sets used in K–12 educational environments.

35. The only real "training" that Edwell does is to support educators' well-being and mental health and that of their students, ensuring that the teachers are using strategies to create a psychologically sale classroom.

36. Edwell has not tried to associate itself in any way with Welles or make itself appear to be associated with Welles.

37. When Edwell was founded in the fall of 2020, none of the founders (all of whom have M.B.A.'s from top schools) who picked the name "Edwell" performed any search through the U.S. Patent and Trademark Office before choosing the name. Neither did any of the founders consult an attorney to determine if the proposed name infringed on any other business's trademark.

## ANALYSIS

This case comes down to the question of whether there is a likelihood of confusion between the consumers of Welles' training programs, with the "edwell" mark used by Defendant Edwell in connection with its educator wellness programming. I find Plaintiff has not met its burden of proving a likelihood of confusion. Thus, Plaintiff has not proved a substantial likelihood of success on the merits of its claim that Edwell is infringing on Welles' "Edwel" mark. I will therefore deny the requested preliminary injunction.

As Plaintiff's counsel in its closing argument emphasized, there are three elements to a successful trademark infringement case. First, the plaintiff must show it has a protectable interest in the trademark. Second, the defendant must be using an

identical or similar trademark in commerce. And third, the defendant must have likely confused consumers by its use of the similar or identical mark. *1–800 Contacts, Inc.*, 722 F.3d at 1238**.**

Here, there is no debate that Welles has a protectable interest in the "Edwel" mark. This is proven by the registration. It is a valid and enforceable word mark that consists of standard characters without claim to any particular font, style, size, or color. It has not been abandoned and Welles continues to use the mark.

Second, there is no meaningful debate as to whether the two marks are issue are substantially identical. The two marks, "Edwel" and "Edwell," differ by a single letter. The two words are pronounced exactly the same way. They are substantially identical marks.

The third consideration is the likelihood of confusion. "The final determination of likelihood of confusion must be based on consideration of all relevant factors; in every case, however, the key inquiry is whether the consumer is likely to be deceived or confused by the similarity of the marks." *Heartsprings*, 143 F.3d at 554. The factors that might lead to a finding of likelihood of confusion are interrelated and must be considered as such in assessing the likelihood of confusion. "For example, a small degree of similarity between two marks may lead to a finding that confusion is likely when the products are identical, inexpensive items. On the other hand, very similar marks may not generate confusion as to the source of the products where the products are very different or relatively expensive." *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir. 1986).

Applying the Tenth Circuit's six factor test for likelihood of confusion by consumers, I find the following:

(1) <u>The degree of similarity between the marks, including the marks' appearance, pronunciation, suggestion, and manner of display</u>: As noted, I do find that the marks are nearly identical, both in spelling and in pronunciation. This factor weighs in favor of a finding of a likelihood of confusion.

(2) <u>Strength or weakness of the plaintiff's mark</u>: To determine the relative strength of a plaintiff's trademark, the mark must be placed in one of five categories of increasing distinctiveness and strength: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Heartsprings*, 143 F.3d at 555.

> A generic term is a term used to describe the relevant type or class of goods. It is the weakest mark. A descriptive term describes a characteristic of a product or service. The third, and stronger, mark is a suggestive mark, which suggests rather than describes a characteristic of the product and requires the consumer to use imagination and perception to determine the product's nature. And finally, an arbitrary or fanciful mark is the strongest mark. An arbitrary mark has a common meaning unrelated to the product for which it was assigned, while a fanciful mark signifies nothing but the product.

*Id.* (quoting *First Sav. Bank, F.S.B. v. First Bank System, Inc.*, 101 F.3d 645, 654–55 (10th Cir. 1996)). I find that "Edwel" is a suggestive mark, which derives from "education done well" and suggests the quality of Welles' PMP certification classes. Thus, it is a moderately strong mark.

(3) <u>The intent of the alleged infringer in adopting its mark</u>: I do not find any wrongful or nefarious intent by Edwell in adopting the "Edwell" mark. The explanation that "Edwell" came from the concept of "education wellness" is reasonable and I credit Ms. Fleischer's testimony that Edwell was unaware of Welles or its use of the "Edwel"

mark. There was no intent by Edwell to capitalize on the reputation or goodwill established by Welles in the "Edwel" mark. It is true that Edwell's three founders with MBA degrees from three top business schools (Yale, Stanford, and the University of Chicago) should have had the foresight to do a basic trademark search before adopting a name for their new venture. Regardless, I do not find that this factor weighs in favor of finding a likelihood of confusion. There was no "deliberate adoption of a similar mark" here, and there can be no inference of an attempt to "pass off" Edwell's education wellness programming as originating with Welles. *See Beer Nuts, Inc.*, 805 F.2d at 927 (analyzing factors giving rise to inference of intent). This is not a situation where the alleged infringer "adopted its mark for the purpose of deriving benefit from a plaintiff's existing mark." *Heartsprings*, 143 F.3d at 556.

(4) <u>Similarities and differences of the parties' goods, services, and marketing strategies</u>: This factor was hotly disputed in the presentation by counsel. Welles argues that it teaches a variety of different classes and programs to business professionals, and therefore it should be considered in the "education" space. And, because Edwell is providing "coaching" and "seminars" to teachers in connection with its education wellness programming, Welles argues that Edwell, too, is in the "education" space and is likely to be confused with Welles as a purveyor of PMP certification classes.

I disagree. I find that there are substantial differences between the services provided by Welles and Edwell. As explained in its trademark registration document, Plaintiff's Exhibit 28, Welles conducts classes, seminars, and workshops *in the fields of project management and product management*. By contrast, Edwell provides one-on-one coaching and counseling in the area of mental health, stress reduction, and

14

wellness for public school teachers, administrators, and students. Welles markets to large companies and organizations, as well as individuals who are seeking additional training and certifications to further their business careers. Edwell attempts to partner with public schools and public-school districts to provide offerings to teachers who need wellness coaching and coping mechanisms. Although both parties use websites for their marketing, every company in America today uses websites in their marketing. And, though Welles provides its services to colleges and universities, Edwell only provides services to K–12 public schools. A review of the respective websites of Welles and Edwell shows the two entities are not competing organizations and are not providing even remotely similar services. Welles and Edwell have fundamentally different customers seeking fundamentally different kind of services. This factor strongly favors a finding of no likelihood of confusion. *See Heartsprings*, 143 F.3d at 556 (affirming district court's findings in copyright case that "the parties are not competitors and do not provide products for the same groups of consumers," which supported a finding of no likelihood of confusion).

(5) <u>The degree of care likely to be exercised by purchasers of the goods or services involved</u>: As to the degree of care exercised by purchasers, I find that both these services (Welles' PMP certification classes and Edwell's education wellness programming) would involve a high degree of care exercised by potential customers. These are not low-cost, impulse purchase items. Although there was no testimony as to the cost of either Welles' certification courses or Edwell's education wellness programming, I find that because both endeavors require a significant investment of time and energy, the prospective individual purchaser (i.e., the corporate client or the

15

school district or school) will likely conduct substantial due diligence before signing on to a program. The likelihood that someone looking for Welles' PMP certification classes would end up mistakenly in one of Edwell's education wellness coaching sessions (or vice versa) is slim to none.

(6) <u>Evidence of actual confusion, if any</u>: To be relevant, such evidence should demonstrate actual confusion among consumers within the marketplace. *Coherent, Inc. v. Coherent Techs., Inc.*, 935 F.2d 1122, 1126 (10th Cir.1991). I find there was no meaningful evidence of actual confusion between Welles' services and those of Edwell. One question over the telephone, by an unidentified party, about whether Welles offers classes at Denver North High School, is not meaningful evidence of confusion. Neither is an unclear reference to Welles' programs being "sketchy," without any reference to Edwell. While customer enquiry evidence may be admissible and relevant, "standing alone with no other evidence it is insufficient proof of actual confusion." *Jordache*, 828 F.2d at 1487 (quoting 2 J. McCarthy, *Trademarks and Unfair Competition* § 23:2(B) at 54 (2d ed. 1984)); *see also Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1535 (10th Cir. 1994) (isolated instances of actual confusion are de minimis and insufficient to establish a genuine issue of material fact); 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23.02[2][b], at 29 (3d ed. 1992) ("Evidence of actual confusion of a very limited scope may be dismissed as de minimis: 'Probable confusion cannot be shown by pointing out that at some place, at some time, someone made a false identification.'" (quoting *McGraw–Hill Pub. Co. v. Am. Aviation Assocs., Inc.*, 117 F.2d 293, 295 (D.C. Cir. 1940))). The evidence of actual confusion presented in this case was nothing more than isolated instances (if that) and may be

dismissed as de minimis. In light of the scant evidence presented, this factor weighs against any finding of likelihood of confusion among consumers.

Considering all the relevant factors, I do not find a likelihood of confusion in this case. My conclusion is supported by a review of three arguably similar trademark cases which involved near identical marks attached to different products or services.

In *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550 (10th Cir. 1998), Judge Porfilio affirmed a finding of no likelihood of confusion where a publisher that used the "Heartsprings" mark for materials designed to teach children to resolve conflicts nonviolently brought trademark infringement action against a school for disabled children that used a "Heartspring" mark. In that case, the two trade names marks were nearly identical and pronounced the same way. The plaintiff was involved in publishing educational materials. The defendant was a school that taught physically disabled children basic life skills. Despite both being in the arguably similar "child education" space and the marks being nearly identical, the court held there was no likelihood of confusion: "Beyond the virtual identity between the parties' names and the fact the parties conduct business within the very broad category of products for children, there is little overlap between the parties' products, services or marketing strategies." *Id.* at 558. The same could be said for Edwell and Welles.

In *Coherent, Inc. v. Coherent Technologies, Inc.*, 935 F.2d 1122 (10th Cir. 1991), a laser manufacturer brought suit against a developer of coherent laser radar systems, alleging trademark infringement, false designation or origin, and unfair competition. The trial court entered judgment for the defendant developer, and the manufacturer appealed. The Tenth Circuit affirmed the trial judge's finding of no likelihood of

17

confusion even though both parties worked in the laser technology field, the developer used the word "coherent" in its trade name, and the manufacturer had an incontestable trademark in the term "coherent." The finding was based in part on a lack of evidence of actual confusion by consumers, the fact that the developer had adopted its name in good faith, the two companies were not competitors (although their products were arguably related), and the manufacturer's customers were sophisticated persons. *Id.* at 1125-26. Many of these same circumstances apply equally to the instant case.

Finally, in *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084 (10th Cir. 1999), a retailer that sold camouflage-patterned outdoor apparel under the "King of the Mountain" trademark brought an infringement and dilution action against the promoter and sponsor of "the Jeep KING OF THE MOUNTAIN DOWNHILL SERIES" ski races. While the words of the contested marks were identical, and both products were at least tangentially related to the "outdoor" industry, the Tenth Circuit found no likelihood of confusion and no trademark infringement. *Id.* at 1093.

Plaintiff Welles emphasizes the holding of *Team Tires Plus, Ltd. v. Tires Plus, Inc.*, 394 F.3d 831 (10th Cir. 2005), to argue that trademark rights have been expanded to protect against the use of a mark on non-competing but 'related' goods—that is, "any [good] related in the minds of consumers." *Id.* at 833–34. Thus, per Welles, the fact that Welles and Edwell are not competitors, even indirectly, does not matter. The services they provide—classes or seminars to adults—makes them "related" in the mind of consumers and therefore Edwell must be precluded under trademark law from using a mark similar to Welles' registered mark. The examples provided in the *Team Tire Plus* decision include finding infringement of Aunt Jemima's trademark on pancake batter by

Aunt Jemima syrup, *see Aunt Jemima Mills Co. v. Rigney & Co.*, 247 F. 407, 409–10 (2d Cir. 1917), and infringement on Yale's trademark on locks by Yale flashlights, *see Yale Elec. Corp. v. Robertson*, 26 F.2d 972, 974 (2d Cir. 1928). In the *Yale* case, the Second Circuit made the sweeping proposition that "unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful". *Id*.

In the *Aunt Jemima* case, the decision makes perfect sense—pancakes and syrup are "related" in the minds of consumers and would be purchased from the same store. So too with the *Yale* case; locks and flashlights are hardware items, sold in hardware stores—and they might well be related in the minds of consumers. But even if I were to adopt and implement the rule articulated in the *Yale* case, I would still find no likelihood of confusion here. Edwell's use of the mark is fundamentally different and foreign from Welles' use of the mark. The services the entities provide—mental health and wellness counselling to teachers, versus professional certification training to business professionals—are "so foreign as to insure against any identification of the two."

## CONCLUSION

For the foregoing reasons, I find no likelihood of confusion between the Defendant's use of the "Edwell" mark in connection with its provision of education wellness programming and the Plaintiff's use of its "Edwel" trademark in connection with the provision and marketing of its PMP or other business certification classes. I find that Plaintiff has not demonstrated a likelihood of success on the merits of its trademark infringement or other claims. Plaintiff's Motion for Preliminary Injunction is **DENIED**.

Within 5 days from the date of this Order, the Parties are directed to contact the Court's Chambers to schedule a status conference to discuss the next steps for this case, or whether instead, they would accept conversion of these findings on the preliminary injunction motion to a trial on the merits.

SO ORDERED this 22nd day of July, 2022

_____
N. Reid Neureiter
United States Magistrate Judge